797 P.2d 1133 (1990)
STATE of Utah, in the Interest of L.D.S., A person under 18 Years of Age, Plaintiff and Appellee,
v.
Sherron D. STEVENS, Defendant and Appellant.
No. 890523-CA.
Court of Appeals of Utah.
August 31, 1990.
*1135 Eric P. Swenson (argued), Monticello, for defendant and appellant.
R. Paul Van Dam, Atty. Gen., Frank D. Mylar (argued), Asst. Atty. Gen., Salt Lake City, for plaintiff and appellee.
Before DAVIDSON, GREENWOOD and ORME, JJ.

OPINION
GREENWOOD, Judge:
Appellant Sherron D. Stevens appeals the juvenile court's termination of his parental rights as the father of L.D.S., a minor child. We affirm.

FACTS
L.D.S. was born March 19, 1983. Her mother died a few weeks after the birth. Sherron later married Deanna Hacker, who became L.D.S.'s stepmother. The family also consisted of several children from prior marriages of both Sherron and Deanna and a child later born as their issue.
In September 1985, L.D.S. sustained a serious head injury. After emergency treatment at a local medical clinic, L.D.S. was flown to a hospital in Grand Junction, Colorado, for further medical care. Deanna claimed L.D.S. sustained the injury by falling off a stool in the bathroom. However, based on reports from physicians who treated L.D.S. and inconsistent accounts of the injury, the San Juan County office of the Utah Department of Social Services (Social Services) initiated an investigation of possible child abuse. Sherron admitted to a social worker that his wife, Deanna, prohibited him and other family members from touching L.D.S., explaining that it was Deanna's solution to avoid making a baby of L.D.S. Although the investigation disclosed considerable stress in the family, no reliable evidence of child abuse was discovered. Subsequently, the child abuse investigation was terminated, but Sherron and Deanna, although resentful of the abuse investigation, agreed to a voluntary treatment program in which Deanna was to receive counseling.
During the next two years, through July 1986, numerous reports and complaints concerning abuse of L.D.S. were directed to Social Services. These reports included assertions that L.D.S. had multiple bruises; was never seen playing outside with the other children; appeared emotionally starved, hollow-eyed, apathetic, unresponsive, and withdrawn; and was often dressed inappropriately. Upon investigation by Social Services, Sherron did not deny the reports or complaints. He expressed appreciation for Social Service's concern and stated that he knew there was a problem that had gone on for too long, that he suspected that Deanna was causing L.D.S.'s bruises, and that Deanna had lied to him about it. Social Services then initiated an in-home services program with the Stevens family to provide support, services, and counseling for family and child-care problems.
Following several more neglect reports concerning L.D.S. in May 1987, Social Services intensified its investigations. Merlin Grover, a Social Services caseworker, personally contacted Sherron and discussed the reports with him. Sherron explained to Grover that Deanna became very hostile and defensive whenever Social Services was mentioned and he opined that L.D.S. was just slow. He did agree, however, to spend more time with L.D.S. In a second follow-up visit by Grover, Sherron again expressed a willingness to follow Social Services' suggestions and to give more personal support to L.D.S.
In July 1987, a complaint was received by Social Services that Deanna had forced L.D.S. to eat her own vomit. Upon investigation, Deanna denied the allegation. Following another report in July, Social Services filed its first neglect petition with the *1136 juvenile court and obtained an ex parte order from the court authorizing temporary custody with Social Services. Sherron declined to deliver L.D.S. to Social Services and, without the court's or Social Services' authorization, placed L.D.S. under the care of his brother's family in Colorado. A social worker who visited L.D.S. in Colorado and conducted medical and psychological evaluations reported that L.D.S.'s intellectual skills were below normal, that she isolated herself, and that she was fearful of adults. Following approval by the juvenile court, a plan was implemented by Social Services that required Deanna to receive counseling and both Sherron and Deanna to undergo psychological evaluations, allowed L.D.S. to be returned home on a trial basis with Social Services retaining legal custody, and provided for periodic home visits by Social Services workers. In May 1988, after the Stevens apparently met the terms of the treatment plan, the juvenile court granted Social Services' motion to terminate court ordered supervision.
On June 22, 1988, Social Services received four new reports of Deanna's abuse and neglect of L.D.S. Interviews with L.D.S.'s siblings indicated that Deanna had forced a sock or stocking into L.D.S.'s mouth to stop her from crying, forced L.D.S.'s face into a pillow on the bed to the point where she could not breathe until the other children came into the bedroom to help L.D.S., struck L.D.S. with a broom handle to make her eat, ordered her to eat her own vomit, and required her to spend long periods of time in her room and to retire to bed three hours before the other children. Social Services filed a second child abuse and neglect petition with the juvenile court and obtained an ex parte order from the court to take L.D.S. into protective custody. L.D.S. was temporarily placed with her maternal grandmother.
L.D.S. was then evaluated by Dr. Tyler, a psychologist specializing in child abuse. Dr. Tyler was concerned that L.D.S. might be psychotic and reported several characteristics commonly identified with emotionally and physically abused children. Upon Dr. Tyler's recommendation, L.D.S. was admitted to Primary Children's Hospital in Salt Lake City for further observation and care. Dr. Halverson, a psychiatrist and medical director of the Cottonwood inpatient unit of the hospital, reported that L.D.S.'s symptoms fit the clinical picture of a neglected, mistreated, and emotionally abused child. Following Dr. Halverson's evaluation, L.D.S. was placed with her maternal aunt, where she could receive outpatient counseling at a nearby children's center.
The second neglect petition was later amended to seek permanent termination of Sherron's parental rights. A hearing on the petition was held on November 29 and 30, 1988, and continued on January 17 and 18, 1989, before the juvenile court. Evidence was heard that corroborated the reports and complaints to Social Services, including incidents of Deanna clamping a wooden clothes pin over L.D.S.'s lips, locking L.D.S. in the back of a station wagon on a hot summer day, slapping L.D.S. when she did not eat properly, assigning L.D.S. a disproportionate amount of household tasks, displaying favoritism to the other children, forcefully spanking and kicking L.D.S., keeping L.D.S. in her room for most of the day, and not allowing L.D.S. to talk at the dinner table. Several witnesses, including neighbors and family members, testified of multiple bruises on L.D.S. and of her generally tattered condition. The state also presented witness testimony describing L.D.S.'s remarkable improvement in appearance and behavior since her placement with her aunt.
L.D.S.'s grandmother and her teenage half-brother both had complained to Sherron about Deanna's mistreatment of L.D.S. According to the grandmother, Sherron was unresponsive and later accused her of reporting them to Social Services. According to the brother, Sherron instructed him to report any future incidents to him and occasionally got after Deanna when she kicked or slapped L.D.S.
In June 1989, the juvenile court entered findings of fact and conclusions of law, determining that L.D.S. was a neglected and abused child and that Sherron was an unfit parent under Utah Code Ann. *1137 § 78-3a-48 (1987),[1] who failed to give her proper parental protection. The court found that there was a high risk of future emotional abuse if L.D.S. returned to the Stevens' home and that the limbo status of extended foster care was not in L.D.S.'s best interest. The court further determined that it would be in the best interest of L.D.S. to permanently terminate Sherron's parental rights and permit the adoption of L.D.S. into a permanent home without Sherron's consent. The juvenile court ordered permanent termination of Sherron's parental rights and that the custody of L.D.S. be placed with the Utah State Department of Social Services' Division of Family Services for adoptive placement.
On appeal, Sherron claims the juvenile court abused its discretion in several instances by improperly admitting evidence at trial that cumulatively deprived him of a fair trial. He also claims the evidence is insufficient to terminate his parental rights.

ADMISSION OF EVIDENCE
We first address the series of evidentiary errors that Sherron contends occurred in the juvenile court. The general rule regarding the admission or exclusion of evidence is that the trial court's decision will not be reversed in the absence of an abuse of discretion. Pearce v. Wistisen, 701 P.2d 489, 491 (Utah 1985); Ostler v. Albina Transfer Co., Inc., 781 P.2d 445, 447 (Utah Ct.App. 1989). Further, although basic constitutional provisions of due process and rules of evidence should be adhered to, "juvenile court proceedings are highly equitable in nature, designed to inquire into the welfare of children, are not adversary in the usual sense, and may be conducted in an informal manner." State ex rel. S.J., 576 P.2d 1280, 1283 (Utah 1978).
Sherron first argues that allowing social worker Mark Lyman to testify at trial violated confidentiality requirements applicable to social workers under Utah Code Ann. § 58-35-10 (1990). Lyman began counseling Deanna prior to his appointment as Director of Social Services for San Juan County. The court found that after Lyman became director, Deanna was informed of Lyman's new position, and that Lyman was required by law to report incidents of child abuse. Deanna agreed to continue counseling with Lyman, and further agreed that Lyman could interview three other Stevens children about abuse of L.D.S. on June 22, 1988. Lyman had independently been given similar information shortly before the interview. After interviewing the three children, Lyman talked to Deanna and she "then admitted that the incidents were or could be true." The court's findings detail what Lyman told Deanna the children had said, and Deanna's responses to the various alleged incidents.
Utah Code Ann. § 58-35-10 (1990) states in pertinent part:
No social service worker, certified social worker, or clinical social worker who is licensed or certified under this chapter shall disclose any information he may have acquired from persons consulting him in his professional capacity except:
(1) with the written consent of the client, or, in the case of death or disability of the client, with the written consent of the client's personal representative or other person authorized to sue on behalf of the client, or the beneficiary of an insurance policy on the client's life, health, or physical condition;
(2) he shall not be required to treat as confidential a communication that reveals the contemplation or commission of a crime... .
Sherron concedes that under section 58-35-10 and the reporting requirements of child abuse in Utah Code Ann. § 62A-4-503 (1989),[2] Lyman's mere reporting *1138 of the complaint he received on June 22, 1988, would have properly been admitted at trial. However, Sherron argues that Lyman went beyond merely reporting a crime and inappropriately testified regarding information that he gained exclusively in his counseling sessions with Deanna, thereby violating her privilege of confidentiality. We disagree. The court properly allowed the testimony on the basis of section 58-35-10(2). The statute clearly states the communication is not confidential if it concerns a crime. This contemplates more than mere reporting, thus allowing testimony of the communication.
We also find that Sherron had no standing to assert the social worker-client privilege under section 58-35-10. The privilege must be claimed by the client or by those specifically authorized to do so by section 58-35-10(1). Unless specifically authorized by statute or rule to claim the privilege on the client's behalf, a party has no standing to complain that testimony will violate another person's privilege. See In re Adoption of Diane, 400 Mass. 196, 508 N.E.2d 837, 840 (1987); State v. Echols, 152 Wis.2d 725, 449 N.W.2d 320, 324 (Ct. App. 1989). Since there is no showing that Sherron was authorized to assert the privilege on Deanna's behalf as required by the statute, Lyman's testimony need not have been excluded on the basis of the privilege. We do not ground our holding solely on this basis, however, because the pleadings in this case indicate counsel was representing both Deanna and Sherron in asserting the privilege, although only Sherron was technically a party to the proceeding.
Sherron also argues that the juvenile court erred in allowing Lyman to testify as an expert witness. Sherron contends that a comparison of Lyman's credentials with Dr. Halverson's clearly demonstrates Lyman's lack of qualification as an expert in the field of child abuse matters. Under Utah Rule of Evidence 702, the critical factor is whether the expert can assist the trier of fact, and, as a result, the trial court has discretion to qualify the proposed expert. State v. Espinoza, 723 P.2d 420, 421 (Utah 1986); Schindler v. Schindler, 776 P.2d 84, 89 (Utah Ct.App. 1989). The Utah Supreme Court recently held that the trial court did not abuse its discretion in allowing a social worker, who had extensive qualifications in the area of child sexual abuse, to testify. State v. Eldredge, 773 P.2d 29, 36-37 (1989). Similarly, in this case, our thorough review of the record convinces us that Lyman was appropriately qualified in the area of child abuse and that the trial court did not abuse its discretion by allowing him to testify.
Sherron next argues that the juvenile court erred in allowing Lyman to testify as to the contents of statements made to him by three of L.D.S.'s siblings. Sherron contends that Lyman's testimony of the children's statements constitutes hearsay and is not admissible under Utah Rule of Evidence 802. We disagree because Lyman's testimony was not offered to prove the truth of the matter asserted, that Deanna abused L.D.S., but to show the chronology of events leading to Deanna's admission of abusive incidents. Lyman testified only as to what he told Deanna about the children's statements and what she said in response. He did not directly testify as to the children's statements to him.
We also reject Sherron's claim that the trial court erred under Utah Rule of Evidence 615 in failing to exclude all witnesses from the courtroom so that they could not hear the others' testimony. The witnesses allowed to remain included Social Services personnel and three expert witnesses.
Utah Rule of Evidence 615 expressly excepts the exclusion of "(1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, *1139 or (3) a person whose presence is shown by a party to be essential to the presentation of his cause."
Counsel for the state argued that the Social Services personnel were representatives of the state under Utah Rule of Evidence 615(2), and that the presence of the expert witnesses was essential to the presentation of its cause under Utah Rule of Evidence 615(3). We find that the court did not abuse its discretion in agreeing with these arguments. The Social Services personnel were logical representatives of the state, and it was within the court's discretion to decide that it was essential to the state's cause that the experts hear the testimony of the other witnesses.[3] Further, even if error occurred under Utah Rule of Evidence 615 in allowing these witnesses to remain in the courtroom, Sherron's claim of unfair prejudice is wholly speculative in this case. Therefore, any error occurring in this respect was harmless.
Sherron also claims the juvenile court erred in admitting various exhibits. Even if the exhibits were improperly admitted, since the juvenile court did not refer to the objected to evidence in its detailed decision, we assume he did not rely on this evidence in rendering his judgment. See State ex rel. S.J., 576 P.2d at 1283.
Sherron argues that the juvenile court erred in admitting evidence in several other instances during the hearing. Following careful consideration of his arguments, we conclude that they are meritless and that discussion of them is unnecessary. See State v. Carter, 776 P.2d 886, 888-89 (Utah 1989).

SUFFICIENCY OF EVIDENCE/NOTIFICATION
We next turn to Sherron's argument that the juvenile court's findings and evidence are insufficient to terminate Sherron's parental rights. The parent-child relationship is constitutionally protected. In re K.S., 737 P.2d 170, 172 (Utah 1987); State ex rel. C.Y. v. Yates, 765 P.2d 251, 255 (Utah Ct.App. 1988). Although the child's best interest is a principal consideration in parental termination proceedings, see State v. Timperly, 750 P.2d 1234, 1238 (Utah Ct.App. 1988), under the due process clause, a finding of unfitness of the parent or substantial neglect must be supported by clear and convincing evidence. In re K.S., 737 P.2d at 172. Consequently, so long as the evidence meets the clear and convincing criteria, "[w]e will not disturb the juvenile court's findings and conclusions unless the evidence clearly preponderates against the findings as made or the court has abused its discretion." State ex rel. C.Y., 765 P.2d at 255.
To terminate parental rights for unfitness, the parent's conduct must substantially depart from the norm; the unfit parent is one who "`substantially and repeatedly refuse[s] or fail[s] to render proper parental care and protection.'" State ex rel. C.Y., 765 P.2d at 255 (quoting State ex rel. S.J., 576 P.2d at 1282). Moreover, the state has no duty to attempt to assist or rehabilitate an unfit parent when there is a consistent pattern of physical abuse and/or neglect and "when it is clear such efforts would be futile." State v. Harrison, 783 P.2d 565, 571 (Utah Ct.App. 1989).
We find the evidence clear and convincing that Sherron substantially and repeatedly refused or failed to render proper parental care and protection to L.D.S., primarily because he did not prevent his daughter from being physically abused and neglected by Deanna. We, therefore, agree with the juvenile court that Sherron is an unfit parent.
The gist of Sherron's insufficiency of evidence argument, however, focuses on whether he had adequate notice of the problem. He contends that he was provided with only cursory details of the abuse allegations and that the state's treatment was primarily directed towards Deanna rather than himself. Where children *1140 are physically endangered by abuse or neglect, notification of deficiencies need not be formal. J.C.O. v. Anderson, 734 P.2d 458, 463 (Utah 1987). The court found that Sherron was repeatedly informed by family members and Social Services personnel of Deanna's abuse and neglect of L.D.S. By his own admission, he acknowledged awareness of Deanna's treatment of L.D.S. and the detrimental effect such treatment had on the child. He discounted the seriousness of Deanna's conduct and, after substantial contact with Social Services personnel, rationalized their attention as just meddlesome interference. Further, when L.D.S. was placed in protective custody both times, the petitions identified the specific reasons for removing her from the family. The fact that Sherron may not have shared involvement with Deanna in her treatment programs does not discount his awareness of the abuse and neglect of L.D.S. We find, therefore, that Sherron had reasonable notice of the deficiency in his parenting fitness. See, e.g., State v. Harrison, 783 P.2d at 571-72.
Affirmed.
DAVIDSON and ORME, JJ., concur.
NOTES
[1] Section 78-3a-48 states in pertinent part:

(1) The court may decree a termination of all parental rights with respect to one or both parents if the court finds either ... as follows:
(a) that the parent or parents are unfit or incompetent by reason of conduct or condition which is seriously detrimental to the child... .
[2] Section 62A-4-503 states in pertinent part:

(1) Whenever any person including, but not limited to, persons licensed under the Medical Practice Act or the Nurse Practice Act, has reason to believe that a child has been subjected to incest, molestation, sexual exploitation, sexual abuse, physical abuse, or neglect, or who observes a child being subjected to conditions or circumstances which would reasonably result in sexual abuse, physical abuse, or neglect, he shall immediately notify the nearest peace officer, law enforcement agency, or office of the division... .
[3] Permitting experts to remain in court is particularly defensible since testimony of fact witnesses may bear on, or cause some modification or reassessment of, their opinions.