960 P.2d 403 (1998)
STATE of Utah, in the INTEREST of J.N., L.N., C.N., and A.N., persons under eighteen years of age.
STATE of Utah, DIVISION OF CHILD AND FAMILY SERVICES, Appellant,
v.
J.N., Appellee.
No. 960836-CA.
Court of Appeals of Utah.
June 4, 1998.
*405 Jan Graham, Attorney General and Carol L.C. Verdoia, Assistant Attorney General, Salt Lake City, for Appellant,
William R. Russell, Rilling & Associates, Salt Lake City, for Appellee.
Martha M. Pierce, Office of Guardian Ad Litem, Salt Lake City, Guardian Ad Litem.
Before WILKINS, BENCH and BILLINGS, JJ.

OPINION
WILKINS, Associate Presiding Judge:
The State, joined by the Guardian Ad Litem, appeals from the juvenile court's dismissal of a petition brought by the Division of Child and Family Services (DCFS) to terminate J.N.'s (Father) parental rights to J.N., L.N., C.N., and A.N. (the children). We reverse and remand.

BACKGROUND
Mother and Father, who are the children's parents, divorced in January 1994. The divorce decree named Mother the children's legal custodian and allowed Father only supervised visitation.
Mother was incarcerated in September 1994, so the children went to live with their maternal aunt. However, the aunt became unable to care for the children without court intervention. As a result, in November 1994, DCFS petitioned for the children's custody and the children were placed in foster care. In June 1995, the children were adjudicated as dependent. The children have remained in foster care since they were removed from their aunt's home in November 1994.
DCFS issued several service plans regarding the children. Among them were two six-month plans signed by Father. The first of these two plans was dated June 7, 1995, through December 7, 1995 (the first service plan). Although the first service plan did not include Father's name on the front page, part of the plan spelled out requirements written specifically for Father. This plan also stated that Father was entitled to DCFS services "to be able to have custody and guardianship of his children if he seeks it."
DCFS issued the second of these two plans in December 1995 (the second service plan). Although the second service plan included many of the same objectives as the first service plan, the second service plan contained more specific time limitations, explanations, and details than the first. Reunification services with Mother had been terminated, so the stated goal of the second service plan was to return the children home to Father.
Both service plans notified Father that his failure to comply with them could result in negative consequences, including termination of his parental rights. The first service plan warned, immediately above Father's signature, "Non compliance [sic] will result in a negative report to the court, and will result in planning for alternative permanency goals for the children, not to exclude permanent deprivation of the parents' rights and adoption." The second service plan declared, beginning on the sixth line above Father's signature, "Noncompliance will compromise [the children's] best interests, and will certainly result in court action oriented toward discontinuing reunification services and steps taken to terminate parental rights, at which time [the children] will be put up for adoption."
On April 18, 1996, four months into the second service plan, the juvenile court held a permanency hearing.[1] At the conclusion of this hearing, the juvenile court made, among others, the following findings of fact:
1. Reunification services were provided to [Father]. The services provided were of a nature to reunify the family.
2. [Father] has failed to meet the goals of the treatment plan, either in whole or in part. The evidence before the court is *406 relatively thin as to the issue of [Father] demonstrating that he completed an anger-management course and why [Father] did not make prompt efforts to modify his divorce decree to allow unsupervised visits. [Father] may dispute this finding at a later court date.
. . . .
4. As a result of [Father's] noncompliance with the treatment plan and [Mother's] lack of effort on the part of the children, a return of the children to their natural parents would endanger the children.
Based upon its findings, the juvenile court then made several orders, including the following: (1) that the children's custody and guardianship remain with DCFS, (2) that the State terminate Father's reunification services, and (3) that the State change the permanency plan to adoption. After the court issued these orders, the State filed a petition to terminate Father's parental rights and a final treatment plan was designed with adoption as the stated goal.
After the juvenile court issued its order, the State filed a petition, based on four statutory grounds, to terminate Father's parental rights to the children.[2] However, following a three-day trial, the juvenile court concluded the State had not presented sufficient evidence to establish any of the four legal grounds upon which the termination petition was based.
The juvenile court made many findings of fact to support its conclusion. Among these findings were the following:
12. By the terms of [the second service plan], and considering the effective date as being December 18, 1995, [Father] was given a total of 24 days, a period which extended over the Christmas and New Year holiday season, to accomplish or produce written evidence of compliance. . . . [Father] failed to adequately understand and meet these deadlines. . . .
13. [Father's] compliance on this second plan designed for reunification of the children with him, was significantly different than the first. During the time period of this second plan he obtained and maintained full time employment, remarried, and secured stable housing in Utah county, although not within the time deadlines....
. . . .
16. At a further review hearing on April 18, 1996, the court found that [Father] had failed to comply with the treatment plan at that point, had failed to secure modification of his divorce decree, and discontinued reunification services but ordered that visitation could continue as it was desired by [Father] and was not opposed by the children's therapist. However, this termination of services to [Father] was ordered after the second plan had been in effect for four (4) months and had two months to run prior to its scheduled termination in June 1996. The [S]tate's petition to terminate [Father's] parental rights was filed the month following this hearing on May 16, 1996.
After entering its numerous findings of fact, the juvenile court then addressed each of the four grounds upon which the State had based its termination petition. Because the court concluded insufficient evidence had been presented to prove by clear and convincing evidence any of the four grounds for termination, the court dismissed the petition.

ISSUES AND STANDARDS OF REVIEW
The State attacks the juvenile court's statutory findings that the State did not prove by clear and convincing evidence the grounds for terminating Father's parental rights. The State makes this attack by arguing the juvenile court made a mistake of law that underlies its findings that the statutory grounds for terminating parental rights did not exist. See Utah Code Ann. § 78-3a-407 (Supp.1995) (listing grounds for terminating parental rights). Specifically, the mistake of law asserted by the State is that the juvenile court erred in faulting the State for terminating reunification services to Father when the court had previously ordered in its permanency *407 hearing ruling that the State terminate those services.[3]
We will disturb the juvenile court's decision not to terminate parental rights only if its findings are clearly erroneous. See Utah R. Civ. P. 52(a); State ex rel. P.H. v. Harrison, 783 P.2d 565, 570 (Utah Ct.App. 1989); see also Utah Code Ann. § 78-3a-407 (Supp.1995) (listing statutory findings required to terminate parental rights). The clearly erroneous standard "`requires that if the findings ... are against the clear weight of the evidence, or if the appellate court otherwise reaches a definite and firm conviction that a mistake has been made, the findings... will be set aside.'" State ex rel. T.E. v. S.E., 761 P.2d 956, 957 (Utah Ct.App. 1988) (quoting State v. Walker, 743 P.2d 191, 193 (Utah 1987)). Moreover, we defer to the juvenile court because of its "`advantaged position with respect to the parties and the witnesses'" in assessing credibility and personalities. State ex rel. P.H., 783 P.2d at 570 (quoting Robertson v. Hutchison, 560 P.2d 1110, 1112 (Utah 1977)).
However, we address under a different standard of review the State's specific argument that the juvenile court erred as a matter of law by faulting the State for terminating services. This argument requires us to interpret Utah statutes governing juvenile court proceedings involving abused, neglected, and dependent children. "`"We review questions of statutory interpretation for correctness giving no deference to the trial court's interpretation."'" A.E. v. Christean, 938 P.2d 811, 814 (Utah Ct.App.1997) (quoting State ex rel. R.N.J., 908 P.2d 345, 349 (Utah Ct.App.1995) (quoting Wells v. Wells, 871 P.2d 1036, 1038 (Utah Ct.App.1994))); see also State v. Pena, 869 P.2d 932, 936 (Utah 1994).

ANALYSIS
To begin our analysis, we first examine the statute governing permanency hearings. See Utah Code Ann. § 78-3a-312 (Supp.1995).[4] As this court has previously explained, "[t]he purpose of the [permanency] hearing statute is to protect the parent, viz., to give him or her an opportunity for a hearing within [the statutorily prescribed time period] so that the child may be reunified with the parent if found to be appropriate." A.E., 938 P.2d at 815. Consistent with this sentiment is the language of the statute, which provides that, after the permanency hearing, the juvenile court shall return the child to the parent's custody unless the court makes a specific finding. See Utah Code Ann. § 78-3a-312(2)(a) (Supp.1995). That finding, based on a preponderance of the evidence, is that returning the child to the parent's custody "would create a substantial risk of detriment to [the child's] physical or emotional well-being." Id.
Another purpose the permanency hearing statute serves is to compel the end of the period during which a child is in legal limbo and the parent is receiving reunification services from the State. See id. § 78-3a-312(1) ("A [permanency] hearing shall be held by the court no later than 12 months after the original removal of the child.").[5] This second purpose is consistent with recent amendments enacted under the Child Welfare Act designed to protect children by ensuring that *408 they are not in legal limbo for an unwarranted time period. See A.E., 938 P.2d at 814; State ex rel. J.L.W., 900 P.2d 543, 549 & n. 13 (Utah Ct.App.1995). This goal to timely end legal limbo is accomplished by continually moving the case toward the ultimate goal of providing permanency for abused, neglected, and dependent children. Cf. Utah Code Ann. § 78-3a-311(3) (1996) (declaring that State has "interest in and responsibility to protect and provide permanency for children who are abused, neglected, or dependent").
The permanency hearing ends legal limbo for a child in one of two ways. First, the court could order that the child be returned to the parent. Alternatively, if the juvenile court finds that returning the child to the parent poses a substantial risk to the child's well being, and thus does not return the child to the parent, the permanency statute requires that the court make other orders. For example, the court must order both the termination of reunification services[6] and the development and implementation of a permanent plan for the child. See id. § 78-3a-312(3)(a), (b) (Supp.1995); see also id. § 78-3a-311(2)(c) (providing that permanency plan for child "shall be finalized" if child cannot be safely returned to parent's care and custody after twelve-month period). Based on these orders, the case proceeds in the direction decided at the permanency hearing, continually following the statutory time limitations so that the child may, in a timely way, discover the end of legal limbo.[7]
The State is the party that carries out the court's orders to terminate reunification services and to develop the child's permanency plan. It provides the reunification services to the parent, and when so ordered, must stop providing reunification services. If the court orders the termination of reunification services, the State's focus shifts. It no longer seeks to provide services to reunify the parent and child. Instead, the State focuses on the court's new order to develop and implement the goals of the new plan designed to provide permanency to the child.[8]
With these principles in mind, we now turn to the case before us. The parties do not dispute that the juvenile court's findings and orders entered after the permanency hearing followed the requirements of the permanency hearing statute. In the April 1996 permanency hearing, the court found that DCFS had provided reunification services to Father but that Father had "failed to meet the goals of the treatment plan, either in whole or in part." This finding was, under the permanency hearing statute, a finding of prima facie evidence that returning the children to Father would be detrimental to the *409 children. See id. § 78-3a-312(2)(a) (Supp. 1995) ("The failure of a parent or guardian to participate in, comply with, in whole or in part, or to meet the goals of a court approved treatment plan constitutes prima facie evidence that return of the child to that parent would be detrimental."). Accordingly, the juvenile court also found that, as a result of Father's noncompliance with the treatment plan, returning the children to Father would endanger the children.
Because the court decided not to return the children to Father, it then followed the requirements of section 78-3a-312(3) in issuing its orders. See id. § 78-3a-312(3) (listing orders court "shall" issue if court does not return child to parent or guardian at permanency hearing). Following the requirements of subsection (3), the court terminated the reunification services offered to Father, changed the permanency plan to adoption, and set a pretrial date for termination of Father's parental rights. See id. § 78-3a-312(3)(a), (b). In compliance with the court's order, the State terminated the reunification services that had previously been offered to Father and proceeded with the permanency plan of adoption by filing a petition to terminate Father's parental rights.
However, despite its earlier permanency hearing order to terminate reunification services, the juvenile court faulted the State for terminating Father's services in its ruling on the State's termination petition. In its findings of fact, the court acknowledged that it had discontinued reunification services after the permanency hearing. The court found: "At a further review hearing on April 18, 1996, the court found that [Father] had failed to comply with the treatment plan at that point, had failed to secure modification of his divorce decree, and discontinued reunification services." Nevertheless, the court also suggested that the State should have continued to offer Father reunification services, finding: "However, this termination of services to [Father] was ordered after the second plan had been in effect for four (4) months and had two months to run prior to its scheduled termination in June 1996." Indeed, in its findings of fact, the court noted several times the time deadlines under which Father was forced to work to comply with the second service plan.
Moreover, the court did more than merely suggest the State was at fault for terminating services. In its conclusion, the court actually ruled that the State's failure to continue services violated the law. The court also suggested that the State's termination of Father's services significantly contributed to the court's decision to dismiss the termination petition. For example, in its analysis, the court addressed whether Father had failed to remedy the circumstances causing the children's removal from the home as follows:
The next ground [in the State's termination petition] is that of failure of [Father] to remedy the circumstances that caused the children to be removed from the home. In this regard the evidence clearly shows [Father] was not responsible for the circumstances that caused the children's removal.... Further, in this case there was no evidence that [Father] "substantially neglected", "willfully refused" or was "unwilling" to do what the [S]tate required of him in the second service plan to earn the return of his children. His efforts as to the second plan, while not complete or timely, were in substantial compliance and demonstrated much greater progress and parental commitment than with the first.... Finally, in considering the "diligence" of the [S]tate's efforts, the court cannot overlook the unrealistic time requirements built into the second plan and the fact that it was terminated short of its scheduled completion inconsistent with the standard of six (6) months specified in section 78-3a-408(3). Thus the court concludes the evidence fails to establish [Father's] unfitness by the required statutory standard of proof under Section 78-3a-407(4).
(Emphasis added and in original.) Moreover, in addressing another ground for terminating Father's parental rights, that of failure of parental adjustment, the court simply stated:
All of the comments as mentioned above as to the previous ground[  Father's failure *410 to remedy the circumstances that caused the children to be removed from the home ]are equally applicable to this ground and need not be repeated. The court concludes that the evidence also fails to establish [Father's] unfitness by the required statutory standard of proof under Section 78-3a-407(5).
We agree with the State that the juvenile court erred as a matter of law when it faulted the State for terminating reunification services after the court had specifically ordered that those services be terminated. The permanency hearing statute requires juvenile courts to order the termination of reunification services if the court finds that returning the child to the parent poses a substantial risk to the child's well being. See id. § 78-3a-312(2)(a), (3)(b). The court may not legally choose to disregard that statutory requirement, either directly, by not ordering it, or indirectly, by not complying with it in another way, such as by faulting the State for following it. Cf. A.E., 938 P.2d at 815 (interpreting word "shall" in permanency hearing statute).
To serve the statutory purpose of protecting children by moving them in a timely manner toward a permanent situation, the court's permanency hearing order to terminate reunification services must be binding on both the court and the parties throughout the remainder of the case. The statutory scheme envisions that the order be binding. See, e.g., Utah Code Ann. § 78-3a-311(2)(a) (Supp.1995) (providing that period of providing reunification services shall not exceed twelve months from child's initial removal from home); id. § 78-3a-311(2)(c) (Supp. 1995) (providing that permanency hearing be held no later than twelve months after child's initial removal from home and that if after permanency hearing child is not returned home, permanency plan for child "shall be finalized" (emphasis added)); cf. id. § 78-3a-403(2) (Supp.1995) (defining failure of parental adjustment, one ground for terminating parental rights, as parent's unwillingness or inability "within a reasonable time" to substantially correct circumstances causing child's out-of-home placement). To not treat the order to terminate services as binding on both the court and the parties would frustrate the Child Welfare Act's purpose to protect and provide permanency to abused, neglected, and dependent children because it would cause confusion and delays in the court system by allowing a court to essentially ignore the permanency hearing statute's requirements. In addition, not treating the order as binding would place the State in an unfair and unworkable situation. It would be nonsensical for the juvenile court to be able to hold the State in contempt for not obeying its order, see id. § 78-3a-901(1) (Supp.1997); Utah R. Juv. P. 39(a), while still being able to fault the State in a court decision for obeying the order.
We next examine whether the juvenile court's statutory findings were clearly erroneous as a result of its legal error. Under the clearly erroneous standard of review, we must set aside the juvenile court's findings if either (1) the findings are against the clear weight of the evidence or (2) we "`otherwise reach[] a definite and firm conviction that a mistake has been made.'" State ex rel. T.E., 761 P.2d at 957 (quoting Walker, 743 P.2d at 193)). In this case we do not examine all the evidence and then assess whether the juvenile court's findings are against the clear weight of the evidence. Instead, we set aside the court's findings because we have reached a definite and firm conviction that the juvenile court made a legal mistake that permeated its findings and consequently calls into question the court's decision not to terminate Father's parental rights. For example, contrary to law, but throughout its findings, the court weighed the termination of services both in Father's favor  in assessing whether Father timely and diligently complied with the reunification plans  and against the State  in considering whether it diligently made efforts to offer Father services. This mistaken application of the law strongly calls into question the court's statutory findings that the State failed to prove any ground upon which it based its petition.
For example, the court's legal error makes suspect its statutory finding that there was no failure of parental adjustment on Father's part, which ground was asserted *411 by the State in its petition. Failure of parental adjustment "means that a parent or parents are unable or unwilling within a reasonable time to substantially correct the circumstances, conduct, or conditions that led to placement of their child outside of their home, notwithstanding reasonable and appropriate efforts made by [DCFS] to return the child to that home." Utah Code Ann. § 78-3a-403(2) (Supp.1995). Thus, to find failure of parental adjustment, the court must find (1) that the parent did not correct the troubling circumstances "within a reasonable time" and (2) that DCFS made "reasonable and appropriate efforts" to return the child to the parent. The court in part based its rejection of this ground for termination on its evaluation, which was based on its misapprehension and misapplication of the law, of the State's efforts to provide Father reunification services. The court called the time limitations Father worked under "unrealistic," condemned the State for not providing Father a full six months of services under the second plan, and, overall, questioned the State's diligence in helping Father. These findings can easily be interpreted as having a direct negative impact on the court's decision that the evidence did not support (1) that Father did not correct the troubling circumstances "within a reasonable time" and (2) that DCFS's efforts to help Father were not "reasonable and appropriate." In addition, because the State need only prove one ground for Father's parental rights to be terminated, see Utah Code Ann. § 78-3a-407 (Supp.1995), the effect of the court's legal error on its treatment of this ground calls into question its ultimate decision not to terminate Father's parental rights.
Because the court's legal error causes us to reach a definite and firm conviction that a mistake has been made, we conclude the juvenile court's findings are clearly erroneous. We therefore reverse the court's dismissal of the State's termination petition, reinstate the termination petition, and remand for further proceedings consistent with this opinion.
We emphasize that we are not remanding this case with instructions to terminate Father's parental rights. Instead, we are remanding this case with instructions that the juvenile court redetermine the State's petition in light of the explanation of the law as set forth in this opinion.

CONCLUSION
The juvenile court's permanency hearing order to terminate reunification services was binding on both the court and the parties. As a result, we hold that the juvenile court legally erred when, in its termination trial ruling, it faulted the State for following its permanency hearing order to terminate reunification services to Father. Because this legal mistake permeated the court's findings and calls into question the court's determination that the State failed to present sufficient evidence of the statutory grounds supporting the termination petition, we reverse the dismissal of the State's petition, reinstate the petition, and remand this case for further proceedings consistent with this opinion.
BENCH, J., concurs.
BILLINGS, Judge (dissenting):
The majority reverses the juvenile court's determination that the state did not meet its burden to prove that the non-custodial father's parental rights should be terminated. The majority does so on what it characterizes as the juvenile court's allegedly erroneous determination that DCFS prematurely terminated reunification services to Father. I disagree with the majority's characterization of the juvenile court's decision. The majority ignores crucial findings of fact made by the juvenile court, the deferential standard of review properly applicable to termination proceedings, and the underlying due process rights the Termination of Parental Rights Act (Termination Act) is designed to safeguard. Thus, I respectfully dissent.
In this case the mother had custody of the children before their removal. Father was working out of state. The children were taken into State custody because of neglect and abuse by their mother, and the trial court explicitly found that Father "was not responsible for the circumstances that caused the children's removal." The trial court also made several other pivotal findings that the *412 majority opinion gives lip service to but completely ignores in its analysis. First, the court found that although DCFS had formulated two treatment plans for the children, the first treatment plan focused almost exclusively on reuniting the children with Mother. Only the second treatment plan was expressly designed to reunify the children with Father. Second, the trial court found that when DCFS terminated services Father had only been given twenty-four days to comply with the second treatment plan. Third, the trial court found that Father completed or partially completed all but two elements of the second treatment plan and thus had substantially complied with its requirements. Based on these and other findings, the trial court concluded that DCFS had failed to present clear and convincing evidence that Father was an unfit or incompetent parent. Accordingly, the trial court properly refused to terminate Father's parental rights.

1. Standard of review
In this case, the juvenile court concluded that DCFS had failed to provide clear and convincing evidence of parental unfitness. The juvenile court based this conclusion on numerous well-supported findings of fact.
In child custody or parental rights determinations, "`[we] will not disturb the juvenile court's findings and conclusions unless the evidence clearly preponderates against the findings as made or the court has abused its discretion.'" Ex rel. L.D.S. v. Stevens, 797 P.2d 1133, 1139 (Utah Ct.App.1990) (quoting Ex rel. C.Y. v. Yates, 765 P.2d 251, 255 (Utah Ct.App.1988). See also In re J.D.M., 808 P.2d 1122, 1124 (Utah Ct.App.1991) (juvenile court decision on parental termination "will be disturbed only if the findings are clearly erroneous"); Ex rel. J.R.T. v. Timperly, 750 P.2d 1234, 1236 (Utah Ct.App.1988) (stating juvenile court termination decision will be disturbed "only if the findings are clearly erroneous, i.e., if the findings are against the clear weight of the evidence").
The majority ignores this well-established standard of review by characterizing the trial court's finding as a legal error because it was made under a misapprehension of the statutory scheme. I simply disagree with the majority's characterization of the nature of the issue. As developed more fully later, I conclude the trial court was critical of the actions taken by a different judge sitting pro tern at the permanency hearing and had no misunderstanding of the law. Judge Christean simply found Father had not had a reasonable opportunity to regain custody of his children, and the pro tern judge's premature termination of services was only one of the factors that led Judge Christean to this conclusion.
The majority should have applied the clearly erroneous and abuse of discretion standard established by Yates, 765 P.2d at 255 (stating trial court parental rights determinations will be upheld unless trial court has made clearly erroneous fact findings or abused its discretion under the statute). I would affirm the juvenile court because the court's crucial findings of fact were not clearly erroneous and the court did not abuse its discretion in refusing to terminate Father's parental rights based on these findings.

2. The trial court did not abuse its discretion in determining DCFS did not prove grounds for termination of Father's parental rights.
The Termination of Parental Rights Act states a number of grounds upon which the court may terminate parental rights. See Utah Code Ann. § 78-3a-407 (Supp.1994). Further, section 78-3a-409 (specific considerations where child is not in physical custody of parent) provides additional factors a court shall consider in determining whether to terminate parental rights, including "the services provided or offered to the parent or parents to facilitate the reunion with the child."[1]Id. § 78-3a-409(1)(a). Here, Judge Christean properly weighed the numerous statutory factors and concluded that Father's parental rights should not be terminated. The majority concludes that Judge Christean's assessment that DCFS did not provide adequate services controlled his decision not to terminate. I disagree, concluding his decision *413 was based on a proper application of the entire statutory scheme.
Further, I believe Judge Christean's approach in evaluating these services was proper. At the dispositional review hearing conducted by Chief Justice Zimmerman sitting pro tern for Judge Christean, reunification services that had been offered to Father were terminated. Chief Justice Zimmerman was caught between conflicting statutory directives when he made the decision to terminate services. As Judge Christean noted in his order, under the 1994 statute, Father could have received at least two months, and possibly six months, of additional services before the dispositional review hearing. See Utah Code Ann. § 78-3a-311(2)(a) (Supp. 1994). However, the dispositional review hearing had to be "held by the court no later than 18 months after the original placement of the child." Id. § 78-3a-312(1). Chief Justice Zimmerman was also required to determine at the dispositional review hearing whether or not to reunite the children with Father, and if not, to terminate all reunification services and proceed with a permanency plan. See id. § 78-3a-312(2)(a)-(3)(a). Thus, even though under section 78-3a-311(2)(a), Father was eligible for up to an additional six months of services, section 78-3a-312(2)(a) unequivocally required that a decision be made at the dispositional review hearing whether or not to reunite the children and Father, and if they were not reunited, to terminate all services. This statutory maze is particularly troublesome when dealing with a non-custodial parent who was not involved in the conduct leading to the children's removal in the first place, and who had just recently become the focus of DCFS reunification services. It was this dilemma that Judge Christean was required to sort out at the termination proceeding.
There are significant differences between the focus of a dispositional review hearing and the subsequent termination hearing.[2] I believe it is this fundamental difference that in part underlies Judge Christean's decision. In A.E. v. Christean, 938 P.2d 811, 816 (Utah Ct.App.1997) (citations omitted emphasis added), we stated that
the court's focus in a dispositional review hearing and a termination of parental rights hearing involves different issues of fact and law. The purpose of the dispositional review hearing is to determine whether it is in the best interest of the child to return the child to the parent based on the parent's efforts or progress to improve the conduct or condition alleged to be egregiously detrimental to the child.... [A] dispositional review hearing is directed toward giving parents assistance and an opportunity to improve their parenting skills and be reunited with their children, and also to provide parents with notice that if they fail to remedy their conduct, their parental rights may be terminated.

Thus, the statute contemplates that when a trial court refuses to reunite a parent and child following a dispositional review hearing, the parent still has an opportunity in the time between the dispositional review hearing and the termination hearing to meet the goals of the permanency plan and regain custody of the child.
Judge Christean acted within the discretion granted to him under section 78-3a-409(1)(a) when he: looked at the level of services provided to Father, determined that Father had been presented with an unrealistic timetable to comply with DCFS's demands, and concluded that the services offered to Father were insufficient. I disagree that Judge Christean erroneously blamed DCFS for the termination of services. Rather, Judge Christean evaluated the services provided in a different context. Judge Christean did not have to provide a rubber stamp approval for the preliminary assessment of the level of services offered to Father, made by Chief Justice Zimmerman at the interim dispositional review hearing. In fact, Chief Justice Zimmerman's order explicitly *414 stated that Father could later dispute his findings. At the review hearing, Chief Justice Zimmerman only made a finding that "reunification services were provided to the natural father of the children." This finding did not preclude Judge Christean from determining, after a full review at the termination hearing, that inadequate services were provided.[3]
Judge Christean acted within his discretion in determining that the services were insufficient and unrealistic and thus could not support DCFS's assertion that Father was an unfit or incompetent parent under section 78-3a-408 for failing to substantially comply with the permanency plan.[4]
Even if Judge Christean's determination that the services offered to Father were insufficient was clearly erroneous, his decision not to terminate should still be upheld because the court was not limited to any specific factors in considering whether termination was appropriate. For example, both sections 78-3a-408(2)(a) and -409(1) state that a court "shall consider, but is not limited to" the listed factors in making its determination. (Emphasis added). Here, Judge Christean did not base his decision solely on the level of services provided to Father. In fact, his decision is replete with other factors which suggested termination was inappropriate at that particular time. Judge Christean stated
the evidence clearly shows the father was not responsible for the circumstances that caused the children's removal [from the home]. Nor can he, as non-custodial parent with restricted visitation rights, be held accountable for the neglect or unfitness of the mother as custodial parent. The harm done to children by an offending parent cannot be imputed to the non-offending parent in order to facilitate the termination of parental rights to free a child for adoption. Unless there is evidence of concerted action or common behavior where both parents share custody, which there is not in this case, each parent must be judged on the basis of their own conduct or condition in relation to their children.
In sum, Judge Christean made detailed findings of fact which he applied to the appropriate statutory framework to determine if Father's parental rights should be terminated. I strongly disagree with the majority's lack of deference to the juvenile court judge. Thus I cannot agree that the trial court abused its discretion in refusing to terminate Father's parental rights.

3. Parental rights may not be terminated without clear evidence of unfitness.
Finally, I believe the majority has adopted an unconstitutional interpretation of the Termination of Parental Rights Act. Utah case law unequivocally holds that parental rights may not be terminated absent a finding of unfitness or incompetency. "[I]t is unconstitutional to terminate a parent's rights based upon a finding of the best interest of the child without first finding that the parent is below some minimum threshold of fitness." In re G.D. Jr. & C.D., 894 P.2d 1278, 1284 (Utah Ct.App.1995) (citing In re J.P., 648 P.2d 1364, 1374-77 (Utah 1982)). Parental rights are a fundamental right accorded due process protection under both the Utah and United States Constitutions:
[T]he right of a parent not to be deprived of parental rights without a showing of unfitness, abandonment, or substantial neglect is so fundamental to our society and so basic to our constitutional order ... that it ranks among those rights referred to in Article I, section 25 of the Utah Constitution and the Ninth Amendment of the United States Constitution as being retained by the people.
In re J.P., 648 P.2d at 1375. In In re J.P., the Utah Supreme Court held unconstitutional a statute allowing courts to terminate parental *415 rights based solely on the child's best interests, stating that "[u]nlike the standard of `parental unfitness,' which imposes a high burden on the state in an adversary proceeding, the standard of `best interest' of the child provides an open invitation to trample on individual rights through trendy redefinitions and administrative or judicial abuse." Id. at 1376 (footnote omitted).
Protection of parental rights is incorporated into the current statutory termination procedures under the Termination Act. Thus section 78-3a-406 states:
The court shall in all cases require the petitioner [for termination] to establish the facts by clear and convincing evidence, and shall give full and careful consideration to all of the evidence presented with regard to the constitutional rights and claims of the parent and, if a parent is found, by reason of his conduct or condition, to be unfit or incompetent based upon any of the grounds of termination described in this part, the court shall then consider the welfare and best interest of the child of paramount importance in determining whether termination of parental rights shall be ordered.
Utah Code Ann. § 78-3a-406(3) (Supp.1994).
In this case, Judge Christean was precluded from terminating Father's parental rights unless he made a threshold finding that DCFS had shown one of the grounds for termination existed. In his memorandum decision, Judge Christean examined each of the eight statutory grounds for unfitness at length and explicitly found that DCFS had not produced clear and convincing evidence that any of the statutory grounds existed. He also found that DCFS had either failed to bring any admissible evidence of several alleged grounds for termination or had brought evidence that was so out-of-date it was no longer valid.[5] By reversing the trial court despite these unambiguous findings, the majority has disregarded the structure of the Termination Act, the deference owed to juvenile court fact findings, and the due process implications of terminating parental rights without clear evidence that a parent has fallen below a minimum level of fitness. Thus I must respectfully dissent.
NOTES
[1] For clarification, we note that what are now called "permanency hearings," see, e.g., Utah Code Ann. § 78-3a-312 (Supp.1997), used to be called "dispositional review hearings," see, e.g., id. § 78-3a-312 (Supp.1995). We refer to them throughout this opinion as permanency hearings.
[2] The State's petition also requested the termination of Mother's parental rights, which request was granted on the first day of trial.
[3] The State and Guardian Ad Litem made many arguments on appeal. However, because we conclude that the issue raised by the State regarding whether the juvenile court erred by faulting the State for terminating reunification services to Father after the court ordered the State to terminate those services is dispositive, we do not address the other arguments raised on appeal.
[4] Because the 1995 version of section 78-3a-312 applied when the permanency hearing occurred in this case, we interpret that version of the law when discussing permanency hearings. The Legislature has amended section 78-3a-312 several times since 1995, see, e.g., Utah Code Ann. § 78-3a-312 (Supp.1997), and has recently amended it again, see Enrolled Copy of Child Welfare Amendments, H.B. 239, Utah 1998 General Legislative Session, effective July 1, 1998, at 61-63 (amending § 78-3a-312).
[5] We note that although current law requires that the permanency hearing be held no later than twelve months after the child's original removal, see Utah Code Ann. § 78-3a-312(1) (Supp.1997), when the children were first placed in foster care, the law required that the hearing be held no later than eighteen months after the children's original out-of-home placement, see id. § 78-3a-312(1) (Supp.1994).
[6] The latest amended version of section 78-3a-312 still requires the court to terminate reunification services if the child is not returned home, but allows the court to extend reunification services ninety days past the twelve-month anniversary of the child's initial removal from the home if the juvenile court finds "that there has been substantial compliance with the treatment plan, that reunification is probable within that 90 day period, and that the extension is in the best interest of the child." See Enrolled Copy of Child Welfare Amendments, H.B. 239, Utah 1998 General Legislative Session, effective July 1, 1998, at 62 (amending § 78-3a-312(3)(a)). However, "[i]n no event may any reunification services extend beyond 15 months from the date the child was initially removed from his [or her] home." Id.
[7] For example, under the 1997 amendment to section 78-3a-312, if the final permanency plan for the child is adoption, within 45 calendar days of the permanency hearing, the termination petition must be filed and the pretrial must be held. See Utah Code Ann. § 78-3a-312(4) (Supp.1997).
[8] Although the State no longer provides reunification services to the family, the family may still be reunified. For example, if the juvenile court finds that returning the child to the parent poses a substantial risk to the child's well being, the State may file a petition to terminate the parent's rights. The State, then, under order of the juvenile court, terminates reunification services and focuses on providing permanency for the child in a situation other than with the child's parent. However, the parent's rights will not necessarily be terminated at the trial on the State's termination petition. Cf. A.E., 938 P.2d at 816 (implying that at termination hearing parent may be able to show improvement in parent's situation and behavior has occurred since permanency hearing was held). Although it may be a difficult feat to accomplish, the parent may still be able to change circumstances such that when the petition is tried, the juvenile court will not find by clear and convincing evidence grounds for terminating parental rights. See Utah Code Ann. § 78-3a-406(3) (Supp.1995) (requiring proof by clear and convincing evidence); id. § 78-3a-407 (Supp.1995) (listing grounds for terminating parental rights).
[1] The court must consider the factors listed in Utah Code Ann. section 78-3a-409, but may also consider whatever additional factors it deems pertinent to the termination hearing.
[2] As the majority acknowledges, the children were first removed from the aunt's home in November 1994. Thus, I apply the statute that was in effect at the date of removal and follow the timing guidelines stated therein. See Utah Code Ann. §§ 78-3a-301 to -414 (Supp.1994). In doing so, I recognize that the legislature has subsequently modified many sections of the Child Welfare Reform Act and the Termination Act. See id. §§ 78-3a-301 to -414 (Supp.1997).
[3] Judge Christean retained authority to alter Chief Justice Zimmerman's interim ruling until the issuance of the final order in this case. See Trembly v. Mrs. Fields Cookies, 884 P.2d 1306, 1311 n. 4 (Utah Ct.App.1994) (holding trial court judge could revisit prior judge's interim order in same case because two judges were "a single judicial office for law of the case purposes").
[4] Having a different judge presiding at the dispositional review hearing and at the termination of parental rights hearing is not the normal practice in our juvenile courts. This case is a good example of why it is not ideal to have two different judges involved.
[5] DCFS does not challenge any of these findings except the court's finding that services were inadequate. Nor does DCFS challenge the court's finding that other State evidence of unfitness, such as psychological reports, was either out-of-date or inadmissible.