995 P.2d 17 (1999)
1999 Utah Ct. App. 390
STATE of Utah, In the Interest of S.L., a person under eighteen years of age.
State of Utah, Appellee and Cross-Appellant,
v.
C.A., Appellant and Cross-Appellee.
No. 990128-CA.
Court of Appeals of Utah.
December 30, 1999.
*20 John E. Laherty, Laherty & Associates, PC, Salt Lake City, for Appellant.
Jan Graham, Atty. Gen., and Carol L. Verdoia, Atty. General's Office, Salt Lake City, for Appellee.
Martha Pierce and Tracy Mills, Salt Lake City, Guardians Ad Litem.
Before WILKINS, P.J., GREENWOOD, Associate P.J., and JACKSON, J.

OPINION
JACKSON, Judge:
¶ 1 C.A. appeals from a juvenile court order terminating her parental rights to her son, S.L., under Utah Code Ann. §§ 78-3a-401 to -414 (1996 & Supp.1999). We affirm. The Division of Child and Family Services (DCFS) cross-appeals the juvenile court's stay of the termination order, which was previously vacated by this court.

BACKGROUND
¶ 2 "`Because the termination of parental rights is fact sensitive, we review the facts of the controversy in detail.'" In re J.P., 921 P.2d 1012, 1014 (Utah Ct.App.1996) (citation omitted).
¶ 3 C.A.'s son, S.L., was born on May 31, 1995.[1] In the months before S.L.'s removal from C.A.'s custody, C.A. had been living mainly on the streets and leaving S.L. in her parents' care. C.A. had a history of using cocaine, methamphetamine, and marijuana, and was sometimes on drugs while with S.L. In late August 1997, S.L. found marijuana in C.A.'s purse and gave it to his grandfather. When the grandfather confronted C.A. with this, she became violent and the police were called.
¶ 4 C.A. was charged with assault and possessing marijuana, and S.L. was taken into protective custody by DCFS. When he was taken into custody by DCFS, S.L. was two years and three months old. He had a *21 bite mark on his cheek that had been inflicted by his mother as a disciplinary tactic.
¶ 15 DCFS filed a petition on September 3, 1997, alleging that S.L. was abused and neglected. C.A. admitted to the allegations, stating that she was not able to care for her child at that time. As a result, the juvenile court found that S.L. was neglected and granted custody to DCFS.
¶ 16 DCFS prepared a service plan, with reunification as the goal, which covered the period from September 30, 1997 to March 30, 1998. The plan required C.A. to complete a residential drug treatment program; stay off drugs; obtain and keep suitable housing and employment; and complete parenting classes, peer parenting instruction, individual therapy, anger management therapy, and family therapy with S.L. C.A. began a residential drug treatment program at the House of Hope in late October 1997, but voluntarily left the program on December 23, 1997. As a result, S.L. was never placed with C.A. in the House of Hope's mother and toddler program.
¶ 17 Soon after leaving the House of Hope, C.A. began an outpatient drug treatment program at Odyssey House. C.A. submitted to two urinalysis drug tests in January 1998, testing positive for cocaine both times. C.A. admitted that she used cocaine during that time. She left the Odyssey House program voluntarily after about three weeks.
¶ 18 From about January 27 to May 5, 1998, C.A. had no contact with S.L. or with DCFS. During that time, she says she "disappeared" and was doing drugs, living variously on the streets and with friends. Because of her drug use and failure to complete a drug treatment program, C.A. did not satisfy the requirements of the first service plan. During the time when C.A. "disappeared," DCFS prepared a second treatment plan, covering the period of March 1 through September 1, 1998. The terms of the second plan were identical to the first.
¶ 19 A hearing was held on March 2, 1998 to adopt the second treatment plan. C.A. later testified that she was in sporadic contact with her parents during her "disappearance," and that the notice of this hearing would have gone to her parents' house. Nonetheless, C.A. failed to attend the March 2 hearing. The court adopted the second treatment plan. The court ordered that C.A. have no visitation with S.L. until she had reentered drug treatment and shown some compliance with the treatment plan.
¶ 10 C.A. resurfaced in late April 1998 and contacted DCFS. She decided that she wanted to enter drug treatment and regain custody of her son. She moved in with her brother's family, on the condition that she not use drugs. By July 1998, she was employed full-time and participating in outpatient drug treatment, and was allowed to begin visiting S.L. again. In late July, her brother and sister-in-law confronted her with reports that she had been using drugs with her friends. They also said they found marijuana seeds and stems in her belongings. They said that C.A. admitted she had used drugs twice recently, but said she would not do so again. When she returned home late a few days later, her brother and sister-in-law, believing she had been using drugs again, insisted that she move out.
¶ 11 C.A. took a urinalysis on the morning of August 5, 1998, which was negative.[2] Because her caseworker suspected she might be drinking large quantities of water to flush out her system, C.A. was ordered to take another urinalysis later that afternoon.[3] The second urinalysis tested positive for marijuana. At trial, C.A. denied using drugs during this time but admitted being in the presence of others who were smoking marijuana.
¶ 12 A twelve-month permanency hearing was held on September 3, 1998. The parties, including C.A., stipulated that S.L. could not be returned to C.A. at that time without a substantial risk of harm to him. Accordingly, reunification services were discontinued, *22 and S.L.'s permanency goal was changed to adoption. The State petitioned to terminate C.A.'s parental rights on September 11, 1998.
¶ 13 Trial on the petition was held on December 16 and 17, 1998. At the time of trial, C.A. had completed or was in the process of completing most of the requirements of the second service plan  which had expired on September 1, 1998. At the end of the trial, the court took the matter under advisement. On January 8, 1999, the court entered Findings of Fact, Conclusions of Law, and an Order. In a section captioned "Parental Fitness and Competence," the court found, in relevant part, that
4) On or about August 29, 1997, [S.L.] was removed from the custody of his mother after he had found marijuana in his mother's purse and gave it to his grandparents. The grandfather hid the marijuana from [C.A.] which resulted in a violent reaction from [C.A.,] who was charged with assault and possession of marijuana. When [S.L.] was taken into custody, he had a bite mark on his cheek which had been inflicted by his mother as a form of discipline;
. . . .
6) When [S.L.] was taken into custody, [C.A.] had been basically living on the streets for the previous six to eight months. [S.L.] had been residing with his maternal grandparents when he was taken into custody by the State and he viewed his grandmother as his mother;
7) Prior to [S.L.'s] removal, [C.A.] had a history of using cocaine, marijuana, and methamphetamines. She had allowed [S.L.] in residences where illegal drugs were being used and was periodically under the influence of drugs while she was around [S.L.];
. . . .
16) During the operation of the first treatment plan, [C.A.] failed to complete drug treatment; failed to maintain a drug free lifestyle, she failed to obtain and maintain suitable housing or employment, did not complete a parenting class, anger management counseling, or peer parenting, and failed to complete individual therapy;
17) [C.A.] had no contact with her DCFS worker from January 27, 1998 until May 5, 1998;
. . . .
30) During September of 1997 through January of 1998, [C.A.] had ongoing but irregular visitation with [S.L.] even when she was in substance abuse programs. [S.L.] was somewhat tentative in his visitation with his mother during this time frame and had minimal interaction with her. Visitation was suspended between February and May 1998, because [C.A.] was not involved in substance abuse treatment. [C.A.] didn't have any contact with [S.L.] during this time and he progressed well in her absence.
In May of 1998, [C.A.] resumed visitation with her son and has maintained consistent supervised visitation with [S.L.] since that time. [C.A.] has never demonstrated any signs of drug usage during visits and she has always been appropriate with [S.L.] during visits. [S.L.] does not demonstrate any spontaneous affection toward his mother, and is sometimes apprehensive about visiting with her. [S.L.] always seems to enjoy visits with his mother and is always happy to see her although he generally seeks reassurance from his foster mother before and after visitation;
[C.A.] has not missed any visits with [S.L.] since May of 1998. [S.L.] periodically has emotional difficulty following visitation with his mother. He easily separates from his mother after visits and is often more emotionally needy following visitation with his mother;
31) On September 3, 1998, Reunification Services were terminated by the Court due to a lack of therapeutic recommendation to return [S.L.] to his mother;
32) [C.A.] began paying support for [S.L.] in November of 1998[.]
¶ 14 In a section headed "Best Interest of the Child," the court made the following findings and conclusions:
1) [S.L.] is a sad and clingy three year old. He is easily frustrated and prone to tantruming. [S.L.] has a difficult time engaging in peer play and is very unsure about *23 himself. [S.L.] is approximately one year developmentally delayed;
2) [S.L.] is a difficult and anxious child who has emotional problems which will require intensive therapy for at least six more months and ongoing less intensive therapy after that;
3) [C.A.] doesn't fully comprehend [S.L.'s] needs and does not presently have the skills to successfully parent him;
4) [S.L.] was not bonded with [C.A.] when he was taken into custody;
5) [S.L.] does not view [C.A.] as his mother and does not demonstrate any spontaneous affection toward [C.A.]. [S.L.] shares a strong attachment with his foster mother who he views as his mother. He is very unsure about himself and needs to know where [h]is foster mother is at all times. [S.L.] is very affectionate toward his foster mother and foster family.
6) [S.L.] needs a nurturing, stable relationship with a supportive adult who will help him address his many issues. His relationship with his foster mother gives him the security he needs to successfully confront his emotional problems. He needs a "stay-at-home" mother because he cannot presently tolerate day care and he is thriving in his foster home where he has a stay-at-home mother;
7) [C.A.] is not capable of parenting [S.L.] at this time and [S.L.] would not allow his mother to parent him if he were placed with her today;
8) [S.L.] may not recover emotionally if he were placed with his mother even if she was compliant with treatment and responsive to his needs;
. . . .
11) During the last six months, [C.A.] has made good faith efforts to be reunited with her son;
12) It is in the best interest of [S.L.] to have the parental rights of his biological mother's rights [sic] terminated[.]
The court then concluded that
1) [C.A.] is an unfit and incompetent parent due to her drug addiction and resultant lack of care for her son thereby justifying termination of her parental rights pursuant to [Utah Code Ann. § ] 78-3a-407(3);
2) [C.A.] has experienced a failure of parental adjustment justifying termination of her parental rights pursuant to [Utah Code Ann. § ] 78-3a-407(5). [C.A.] has been unable to correct the conditions which led to the out-of-home placement of her son within a reasonable time frame notwithstanding reasonable and appropriate efforts made by the State to reunite her with her son. Although [C.A.] has made recent efforts to address her substance abuse problems[,] her belated efforts are not sufficient in that she has severely damaged her relationship with her son due to her failure to remedy her drug addiction in a timely manner;
3) It is in the best interests of [S.L.] to have his mother's parental rights permanently terminated.
¶ 15 The court then entered the following Order:
The parental rights of [C.A.] relative to her son, [S.L.], are hereby permanently terminated including any residual rights. Said order is stayed on a day to day basis, subject to terms and conditions to be determined at the January 25, 1999 hearing at 9:15 a.m. The order is stayed on the basis that [C.A.] has made substantial efforts over the past six months to correct the problems which resulted in [S.L.] being removed from her and she now appears to be making good faith efforts to address the needs of her son.
¶ 16 On January 25, 1999, the court held a hearing at which DCFS objected to the stay of the termination order. The court acknowledged that it had
considered the evidence over a period of time and [is] convinced that there was a legal basis to terminate the parental rights of [C.A.] relative to S.[L.] And I'd like to make that clear on the record today. However, it was the Court's impression that [C.A.] had made sincere and good-faith efforts to put herself in a position to be reunited with her son.... And I tried to weigh the best interest of S[.L.] and the rights of [C.A.], and I arrived at the decision *24 I did based on all those considerations.
The court then ordered that reunification efforts be reinstituted and that a new service plan be fashioned to facilitate reunification.
¶ 17 Another review hearing was held on March 8, 1999. DCFS again objected to the stay and order of continued reunification services. The court issued a Review Order stating that
the Court is concerned about both [S.L.'s] well-being and the mother's rights. The Court understands the Children[s] Center['s], DCFS['s], and Ms. Timme's [sic] concerns. The Court is trying to balance the child's best interests and the rights of the mother. The mother is making good faith efforts. The Court will not allow this to go on indefinitely if the child is harmed, even if the mother is making an effort.
Accordingly, the court ordered the parties to proceed towards reunification and declined to terminate services.
¶ 18 On March 25, 1999, DCFS filed a Petition for Extraordinary Relief with this court asking that the stay and the order of reunification be vacated immediately. In an order dated April 15, 1999, this court agreed with DCFS that the judge lacked authority to stay the termination order. Thus, we vacated the stay and all other subsequent orders. Shortly thereafter, DCFS moved this court for a published opinion. We denied that motion. C.A. now appeals the juvenile court's termination of her parental rights, and DCFS cross-appeals the juvenile court's stay of the termination order.

ISSUES AND STANDARDS OF REVIEW
¶ 19 C.A. first argues the evidence presented at trial was insufficient to support several of the juvenile court's findings of fact. The facts supporting termination of parental rights must be proved by clear and convincing evidence. See Utah Code Ann. § 78-3a-406(3) (1996); Santosky v. Kramer, 455 U.S. 745, 747-48, 102 S.Ct. 1388, 1391-92, 71 L.Ed.2d 599 (1982). "Findings of fact in a parental rights termination proceeding are overturned only if they are clearly erroneous." In re S.T., 928 P.2d 393, 400 (Utah Ct.App.1996).
¶ 20 "The clearly erroneous standard '"requires that if the findings ... are against the clear weight of the evidence, or if the appellate court otherwise reaches a definite and firm conviction that a mistake has been made, the findings ... will be set aside."'" In re J.N., 960 P.2d 403, 407 (Utah Ct.App. 1998) (citations omitted) (alterations in original). "Moreover, we defer to the juvenile court because of its `"advantaged position with respect to the parties and the witnesses"' in assessing credibility and personalities." Id. (citations omitted); accord In re G.V., 916 P.2d 918, 920 (Utah Ct.App.1996). In addition, a party challenging the juvenile court's findings must marshal the evidence in support of those findings, and then show that the marshaled evidence is insufficient, as a matter of law, to support the findings. See In re J.M.V., 958 P.2d 943, 947 (Utah Ct. App.1998).
¶ 21 C.A. next argues the court's conclusions of law are not supported by its findings. We will overturn the juvenile court's findings and conclusions only if "`the evidence clearly preponderates against the findings as made or the court has abused its discretion.'" In re M.L., 965 P.2d 551, 559 (Utah Ct.App.1998) (quoting In re C.Y., 765 P.2d 251, 255 (Utah Ct.App.1988)); accord In re S.R., 735 P.2d 53, 56 (Utah 1987).
¶ 22 In its cross-appeal, the State argues the juvenile court lacked the authority to stay its termination order. The State also contends that the court's order of continued reunification services, after the court had terminated C.A.'s parental rights, is contrary to Utah law. Our interpretation of the Termination of Parental Rights Act, Utah Code Ann. §§ 78-3a-401 to -414 (1996 & Supp. 1999), presents a question of law, which we review for correctness. See C.T. ex rel. Taylor v. Johnson, 977 P.2d 479, 480 (Utah 1999).

ANALYSIS

I. Sufficiency of the Evidence
¶ 23 C.A. first argues the evidence presented at trial was insufficient to support *25 the juvenile court's finding number thirty (parental fitness) and findings number four, five, seven, eight, and twelve (best interests). The "mere fact that we could reach a different result than the juvenile court on the same evidence does not justify setting aside the juvenile court's findings." In re S.T., 928 P.2d 393, 401 (Utah Ct.App.1996). Rather, we must be convinced that the juvenile court's findings were "`"against the clear weight of the evidence,"'" or "`"reach[] a definite and firm conviction that a mistake has been made."'" In re J.N., 960 P.2d 403, 407 (Utah Ct.App.1998) (citations omitted). Although C.A. did not marshal "every scrap of competent evidence" supporting the juvenile court's findings, West Valley City v. Majestic Inv. Co., 818 P.2d 1311, 1315 (Utah Ct.App.1991), she substantially complied with the marshaling requirement. We thus address the substance of her challenges.
¶ 24 C.A. has not shown that the juvenile court's findings are clearly erroneous. Our review of the entire record persuades us that there was clear and convincing evidence to support the challenged findings. We note again that we greatly defer to the juvenile court's ability to observe the witnesses and weigh their credibility, in this case, over a period of more than a year. See In re J.N., 960 P.2d at 407. With that in mind, we address each challenged finding in turn.
¶ 25 C.A. first challenges the juvenile court's parental fitness finding number thirty. This finding was supported by clear and convincing evidence. Pamela Ison (Ison), a DCFS caseworker, testified that S.L. interacted minimally with C.A. at their visits. She further stated that she did not see him being spontaneously affectionate with C.A. Dr. Pamela Wilkison (Wilkison), a Children's Center psychologist, testified S.L. does not view C.A. as his mother, and that he regressed more after visits with her. Katina Temme (Temme), a clinical consultant in the Guardian Ad Litem office, also testified that she did not observe S.L. showing spontaneous affection for C.A. Barbara Gallegos, a DCFS case worker assistant, said that S.L. was shy and did not hug and kiss C.A. at the beginning of their visits. Further, she stated S.L. had no trouble leaving C.A. at end of their visits.[4]
¶ 26 C.A. next challenges the best interests finding number four, which states that S.L. was not bonded with C.A. when he was taken into protective custody by DCFS. Admittedly, not much evidence was presented on this point. Nonetheless, the evidence that exists clearly weighs in favor of this finding. The DCFS workers who created both treatment plans recognized S.L.'s lack of bonding with his mother, and accordingly required family therapy to address that issue. Also, Temme testified that she never saw any indication that S.L. had a deep parent-child relationship with C.A. Moreover, C.A. testified that in the months before S.L.'s removal from her custody, he was with his grandparents "most of the time" because she was living on the streets, doing drugs. Thus, we conclude this finding was supported by clear and convincing evidence.
¶ 27 Third, C.A. challenges the best interests finding number five, which states that S.L. was very strongly bonded to his foster mother and viewed her as his mother. Again, this finding is supported by clear and convincing evidence. Ison testified that S.L. seemed very happy in his foster placement and showed a great deal of affection towards his foster family. She also testified that S.L. found it difficult to separate from his foster mother, and continually sought her attention and reassurance. Wilkison testified that S.L. is very bonded to his foster family. Temme testified that S.L. continually sought out his foster mother for reassurance and comfort, and did not like to be separated from her. *26 Further, she testified that S.L. refers to his foster mother  not C.A.  as his "mom."
¶ 28 Fourth, C.A. takes issue with the best interest finding number seven, which states that C.A. was incapable of adequately parenting S.L. at the time of trial. Temme testified that, at the time of trial, she was unsure whether C.A. had the skills necessary to parent S.L. and that S.L. would not allow C.A. to parent him. Wilkison also testified that C.A. was not ready to parent S.L. Ison testified C.A. understood some, but not all, of S.L.'s needs.[5] Accordingly, we conclude this finding was supported by clear and convincing evidence.
¶ 29 Finally, C.A. assails the best interests finding number eight, which states that S.L. "may not recover emotionally if he were placed with his mother even if she was compliant with treatment and responsive to his needs." Temme testified S.L. could "not handle" being placed with C.A. and that it would be "totally devastating" to S.L. to have to view appellant as his mother. She testified further that it was "still unclear" whether S.L. could recover from being forced to change homes. Finally, in a written report, Temme stated that "[t]ransplanting him is very risky[, and] he may not regain what he has now" if he were removed from his foster placement and reunited with C.A. Once again, we conclude this finding is supported by clear and convincing evidence.
¶ 30 In sum, we conclude that the challenged findings were supported by clear and convincing evidence, and we decline to disturb those findings.[6]

II. Challenge to the Juvenile Court's Conclusions of Law
¶ 31 C.A. next argues the juvenile court's findings of fact do not support its conclusions that 1) she was an unfit parent, 2) she experienced a failure of parental adjustment, and 3) termination of her parental rights is in S.L.'s best interests. We disagree.
¶ 32 We will disturb the court's conclusions of law only if we are convinced the court abused its discretion. See In re M.L., 965 P.2d 551, 559 (Utah Ct.App.1998). Moreover, DCFS "need only prove one ground for [C.A.'s] parental rights to be terminated." In re J.N., 960 P.2d 403, 411 (Utah Ct.App.1998) (emphasis added); accord Utah Code Ann. § 78-3a-407 (1996) (providing for termination of parental rights if court finds "any one" of the specified grounds).
¶ 33 The conclusion that C.A. was an unfit parent is supported by findings of fact number four, six, seven, sixteen, and thirty (in the unfitness section) and number three, five, six, and seven (in the best interests section). Hence, we will not disturb this conclusion. C.A. argues further that her progress towards being a fit parent precludes a conclusion that she was unfit at the time of trial. While the juvenile court must consider a parent's present ability, it must also consider the parent's past conduct and the time during which the parent has failed to remedy the situation, thereby causing further deterioration of the parent-child relationship. See In re M.L., 965 P.2d at 561-62.
[I]f a parent has demonstrated some improvement in parenting ability but not a strong likelihood that the parent can provide a proper home for the child in the very near future, after a long period of separation, a history of problems and failure to remedy, and deterioration of the relationship between the child and parent, this court should not overturn a court's order terminating parental rights.
Id. at 562.
¶ 34 C.A. also assails the juvenile court's conclusion that she experienced a failure *27 of parental adjustment. "Failure of parental adjustment" is a ground for terminating a parent's rights. See Utah Code Ann. § 78-3a-407(5) (1996).
"Failure of parental adjustment" means that a parent or parents are unable or unwilling within a reasonable time to substantially correct the circumstances, conduct, or conditions that led to placement of their child outside of their home, notwithstanding reasonable and appropriate efforts made by [DCFS] to return the child to that home.
Id. § 78-3a-403(2). Further, a parent's failure "to comply substantially with the terms and conditions of a [treatment] plan within six months after the date on which the child was placed or the plan was commenced, whichever occurs later, ... is evidence of failure of parental adjustment." Id. § 78-3a-408(3) (Supp.1999).
¶ 35 C.A. does not contest that she failed to complete the provisions of not one but two treatment plans over the course of twelve months. Further, the evidence showed that even at the time of trial  some fifteen months after S.L. was placed in DCFS custody  C.A. was unable to adequately parent S.L. Thus, we affirm the juvenile court's conclusion that C.A. experienced a failure of parental adjustment.
¶ 36 Finally, C.A. challenges the juvenile court's conclusion that terminating her parental rights was in S.L.'s best interest. "If the parent-child relationship has been destroyed by the parent's conduct, or lack of conduct, it is usually in the best interest of the child to terminate that relationship and allow the child an opportunity to establish a meaningful relationship with loving, responsible parents." In re J.R.T., 750 P.2d 1234, 1238 (Utah Ct.App.1988). We again acknowledge that C.A. seemed to be trying to reform and wanted to regain custody of her son. Nonetheless, in light of the evidence presented, we cannot say the juvenile court abused its discretion when it determined that terminating C.A.'s parental rights was in S.L.'s best interests.
¶ 37 Accordingly, we decline to disturb the juvenile court's conclusions of law, and we affirm its order terminating C.A.'s parental rights to her son, S.L.[7]

III. DCFS's Cross-Appeal
¶ 38 DCFS presents two issues in its cross-appeal. First, did the juvenile court lack the authority to stay the termination order? And second, was the juvenile court's order of attempted reunification contrary to law?
¶ 39 "We first address the threshold issue of whether DCFS's claims are moot." In re S.K., 378 Utah Adv. Rep. 11, 12, 987 P.2d 616, 617 (Utah Ct.App.1999). DCFS appeals that portion of the juvenile court's January 8, 1999 Order that stayed the termination on a day-to-day basis and ordered further reunification services. On April 15, 1999, after the State petitioned for an extraordinary writ under Rule 65(B) of the Utah Rules of Civil Procedure, this court ruled that the juvenile court lacked the authority to stay its termination order and mandate further reunification services. Accordingly, we vacated that portion of the juvenile court's order. Because the stay from which the State appeals has been vacated, "`"the requested relief cannot affect the rights of the litigants."'" Strollo v. Strollo, 828 P.2d 532, 533 (Utah Ct.App.1992) (citations omitted). We thus conclude the issue is moot.
¶ 40 Although we generally decline to render an advisory opinion on a moot issue, see In re S.K., 378 Utah Adv. Rep. at 12, 987 P.2d at 617, we will reach the merits "if the case `presents an issue of public import that is likely to recur and is capable of evading judicial review.'" Id. (quoting In re N.R., 967 P.2d 951, 953 (Utah Ct.App.1998)). We conclude the issue "is not one that `is *28 capable of evading judicial review.'"[8]Id. (citation omitted) (stating issue of whether juvenile court erred by not terminating reunification efforts after twelve months can be "readily deal[t] with" by this court). Nevertheless, we will reach the merits of this issue because it is of significant public import and is "`likely to recur.'" Id. (citation omitted). Accordingly, we take this opportunity to state unequivocally that our juvenile courts lack the authority to stay an order terminating a parent's rights, and that such a stay is contrary to the stated goals of our child welfare laws.
¶ 41 A trial court may exercise its discretion to stay a judgment under certain circumstances. See Utah R. Civ. P. 62. However, a court "may not negate its own judgment by indefinitely staying execution thereon." Taylor Nat'l, Inc. v. Jensen Bros. Constr. Co., 641 P.2d 150, 154-55 (Utah 1982) (vacating permanent stay of judgment). "An indefinite stay of execution is as if no judgment had been granted." Id. In this case, the juvenile court did not specify a time period during which the termination order would be stayed. Rather, the order was stayed on a "day-to-day basis." In fact, the termination order, entered on January 8, 1999, was stayed from that date until April 15, 1999, when this court vacated the stay. The juvenile court lacked the authority to stay the termination order on an indefinite, day-to-day basis, thereby negating the effect of its judgment that C.A.'s parental rights should be terminated.
¶ 42 Moreover, such a stay is contrary to the public policy underlying our child welfare laws, whose overarching purpose is to provide stability and permanency for abused and neglected children, and to end the "`legal limbo'" of state custody as quickly as possible. A.E. v. Christean, 938 P.2d 811, 814 (Utah Ct.App.1997) (citation omitted). To that end, the Legislature has crafted "specific time lines ... to prevent a child from languishing indefinitely in foster care." In re J.L.W., 900 P.2d 543, 549 n. 13 (Utah Ct.App.1995). The State will provide reunification services to a parent for a maximum of twelve months after a child's removal from the parent's custody. See Utah Code Ann. § 78-3a-311(2)(b) (Supp.1999). When the child is two years old or younger, that period is shortened to a mere six months. See id. § 78-3a-311(2)(e). "[A] parent's interest in receiving reunification services is limited." Id. § 78-3a-311(3)(a).
¶ 43 Our Legislature has clearly indicated that a parent wishing reunification with his or her child must act quickly towards that end. See id. § 78-3a-408(3) (stating parent's "fail[ure] to comply substantially with the terms and conditions of a [treatment] plan within six months after the date on which the child was placed or the plan was commenced, whichever occurs later, ... is evidence of failure of parental adjustment," which is a ground for terminating parental rights); id. § 78-3a-312(2)(a) (stating at permanency hearing, parent's failure "to participate in, comply with, in whole or in part, or to meet the goals of a court approved treatment plan constitutes prima facie evidence that return of the child to that parent would create a substantial risk of detriment").
¶ 44 Once the court has ordered reunification services, it then must hold a permanency hearing no later than twelve months from the time the child was removed from his or her parent's custody. See id. § 78-3a-312(1)(a). At this hearing, the court is charged with "determin[ing] whether the child may safely be returned to the custody of his [or her] parent." Id. § 78-3a-312(2)(a).
¶ 45 The court's discretion is quite limited at this stage. At the permanency hearing, "[i]f the court finds, by a preponderance of the evidence, that return of the child would create a substantial risk of detriment to the child's physical or emotional well-being, the child may not be returned to the custody of his parent." Id. (emphasis added). "[I]f a child is not returned to his parent ... at the *29 permanency hearing, the court shall order termination of reunification services to the parent, and make a final determination regarding whether termination of parental rights, adoption, guardianship, or long-term foster care is the most appropriate final plan for the child." Id. § 78-3a-312(3)(a) (emphasis added); accord In re J.P., 921 P.2d 1012, 1020 (Utah Ct.App.1996) (stating our statutes "contemplate one of two alternate routes  reunification or termination"). Moreover,
[t]he court may not extend reunification services beyond 12 months from the date the child was initially removed from his home ... except that the court may extend reunification services for no more than 90 days if it finds that there has been substantial compliance with the treatment plan, that reunification is probable within that 90 day period, and that the extension is in the best interest of the child. In no event may any reunification services extend beyond 15 months from the date the child was initially removed from his home.

Utah Code Ann. § 78-3a-312(3)(a) (Supp. 1999) (emphasis added).
¶ 46 Once reunification efforts have ended, our statutory scheme continues its steady march towards permanency and finality for the child. If the final goal is termination of parental rights, the petition must be filed, and a pretrial hearing held, no more than forty-five days after the permanency hearing. See id. § 78-3a-312(4). At this late stage in the game, the court's emphasis shifts from strengthening and preserving the family, which necessarily includes a consideration of the parent's rights, to a sharp focus on the child's best interests. See id. §§ 78-3a-402(2), -406(3) (1996).
¶ 47 Once a parent's rights have been terminated, the court must either "place the child in the legal custody and guardianship of a licensed child placement agency or the division for adoption," id. § 78-3a-411(1) (Supp.1999), or, in the case of a juvenile who has been adjudicated of a crime, choose from a panoply of options listed in section 78-3a-118. See id. § 78-3a-118. "All adoptable children shall be placed for adoption." Id. § 78-3a-411(2) (emphasis added).
¶ 48 In short, our child welfare laws clearly do not authorize the result reached by the juvenile court in this case. Reunification services were provided to C.A. for about eighteen months, in direct contravention of section 78-3a-312(3)(a). Further, once C.A.'s rights were terminated, the court's only option was to move S.L. towards adoption or another permanent status. See id. § 78-3a-411(1). Accordingly, we reiterate that the juvenile court exceeded its authority when it stayed the termination order.

CONCLUSION
¶ 49 The court's findings of fact were supported by clear and convincing evidence, and support the court's conclusions of law. We thus affirm the juvenile court's order terminating C.A.'s parental rights in her son, S.L. Further, the juvenile court lacks the authority to stay termination orders.
¶ 50 Affirmed.
¶ 51 I CONCUR: PAMELA T. GREENWOOD, Associate Presiding Judge.
WILKINS, Presiding Judge (concurring):
¶ 52 The juvenile court is a court of limited jurisdiction. As a creature of statutory authority, its powers are necessarily limited. However, as a court of record, presided over by a constitutionally authorized judge, it also has equitable and other inherent powers. When neither the legislature nor the appellate courts have spoken to the contrary, the juvenile court has considerable opportunity to fashion remedies that will best serve justice, the public good, and the needs of children and families.
¶ 53 In this case, the juvenile court carefully addressed the requirements of the Termination of Parental Rights Act, Utah Code Ann. §§ 78-3a-401 to -414 (1996). The statute requires the court to consider both the parent's behavior and the child's best interest in determining whether or not termination of the parent-child legal relationship is appropriate. Under the Act, the court must first find the statutory grounds necessary to terminate the parent's rights to the child and then find that the child's best interest is *30 thereby served. After making these findings, the court is legally obligated to terminate the parent-child relationship.
¶ 54 The juvenile court found that the mother here had fallen short in a number of serious ways, any one of which is legally sufficient to terminate her legal relationship with her child. The court then considered the evidence relating to what was in the best interest of the child and again decided that this child's best interest would be served by termination of the relationship.
¶ 55 Apparently, having found the necessary legal basis for terminating this parent-child relationship, the court felt strongly that termination was somehow not the best result overall, and sought to modify that severe consequence by allowing the mother an opportunity to show, on a day-to-day basis, that she was making significant improvements in her behavior, sufficient perhaps to change the court's mind about what was in the best interest of the child. In support of the court's action, the mother's counsel argued before us that the court has sufficient equitable power to delay the effect of the termination order, and that to do so was in the best interest of both the mother and the child. Today we have concluded that the juvenile court has no such equitable power under our statutory and case law.
¶ 56 The policy of the law in this instance has been set by the legislature, as is its responsibility. That policy is that parents brought before the court who cannot or will not remedy the conditions giving rise to the child's removal in the first place, and do so within the time limits imposed by the legislature, forfeit their parental rights. The only remaining question is what is in the best interest of the child. If the court finds that the best interest of the child is served by severing that parent-child relationship, the policy of the law is to do so, and to do so promptly, so that the child may be stabilized as quickly as possible in a permanent setting.
¶ 57 Some argue that allowing the juvenile court to stay the effective date of the termination order, day-by-day, for a relatively short period of time, may allow a child and parent to remain a family. They claim this is good public policy. This argument is appealing, but unavailing. The legislature is the place constitutionally anticipated for determinations of complex public policy. Where it has spoken, as it has here, and the policy is clear and not subject to misunderstanding, the courts are obligated to follow that policy. Those who may disagree are best advised to take their differences up with their elected representatives in the legislature.
¶ 58 Others argue that to deprive the juvenile court of the power to stay the effective date of its own orders in termination cases may well be seen to diminish that authority in other circumstances, thereby significantly hampering the broad flexibility so useful in juvenile court matters. I agree. However, a careful reading of the court's opinion today will prevent any such misunderstanding. We have addressed only the circumstances of termination orders, where the juvenile court has made the necessary and requisite findings regarding the behavior of the parent and the best interest of the child, and concluded that the parent-child relationship must be terminated. I, for one, do not intend to address other circumstances at this time.
¶ 59 The legislature has reached a balance between the right of a parent to raise his or her child and the child's right to be raised in a caring, loving, safe, and nurturing environment. Those who believe this balance to have been struck improperly, too much one way or the other, must take that belief to the legislature for action. By being as precise as it has been, for good or ill, the legislature has left little wiggle room for the court. Once a juvenile court has decided that the parent's behavior is legally deficient, and that it is in the child's best interest to terminate the parent-child relationship, the decision is complete and the course of action available to the court is set forth specifically. Practically no flexibility is left to the judge to fashion a different remedy. If the juvenile court believes that it is in the child's best interest not to terminate the parent-child relationship, then the only course presently available is to deny the termination petition.
NOTES
[1] S.L.'s father, R.L., is not a party to these proceedings, as his whereabouts are unknown.
[2] During the time S.L. was in DCFS custody, C.A. submitted to numerous urinalysis tests. All were negative for the presence of drugs, with the exception of the two in January 1998 and the afternoon test on August 5, 1998.
[3] No evidence of "flushing" was ever proved.
[4] C.A. asserts that her time with S.L. was so limited that it would have been hard for him to feel comfortable with her. We agree. However, this does not weigh against the juvenile court's observation of the state of affairs at the time of trial. Moreover, we note that while the parent-child relationship might "deteriorat[e] ... during the time a parent is or should be attempting to improve," we also recognize "the connection between a parent's inaction over a long period of time in ameliorating the conduct or condition that required the child's removal, and the deterioration of the parent-child relationship during that time period." In re M.L., 965 P.2d 551, 560 (Utah Ct.App.1998).
[5] As contrary evidence, C.A. points out her progress towards completing the provisions of the second treatment plan. We agree that C.A. was making progress towards completing the requirements of the second treatment plan, which expired on September 1, 1998, and that she seemed to want to regain custody of her son. This alone, however, does not persuade us that the juvenile court's finding was clearly erroneous.
[6] C.A.'s final sufficiency challenge is to best interests finding number twelve, that it is in S.L.'s best interests to terminate C.A.'s rights. This "finding" is more properly labeled a conclusion of law, and we address C.A.'s challenge to this conclusion below.
[7] C.A. also argues that the juvenile court's stay of its termination order shows that the termination order was not supported by clear and convincing evidence. We disagree, and decline to rely on an order that has been vacated by this court to second-guess the juvenile court's clearly stated and frequently repeated conclusion that legal grounds to terminate C.A.'s rights were proved by clear and convincing evidence.
[8] Indeed, in this particular case, the issue has not evaded our review. By petitioning for extraordinary relief under Rule 65(B), DCFS took the most expedient route to correcting the juvenile court's erroneous stay. See In re S.K., 378 Utah Adv. Rep. 11, 12, 987 P.2d 616, 617 (Utah Ct.App.1999) (recommending Rule 65(B) writ rather than appeal as of right in similar circumstance).