2003 UT App 66

**STATE of Utah, in the interest of S.Y. and Z.Y., persons under eighteen years of age.**

**T.Y., Appellant,**

v.

**State of Utah, Appellee.**

**No. 20020508–CA.**

Court of Appeals of Utah.

March 6, 2003.

Gary L. Bell, Salt Lake City, for Appellant.

Mark L. Shurtleff, Attorney General, Carol L. Verdoia, and John M. Peterson, Assistant Attorneys General, Salt Lake City, for Appellee.

Martha Pierce, Salt Lake City, Guardian Ad Litem.

Before Judges BILLINGS, BENCH, and GREENWOOD.

<hr />

**1.** M.Y., the natural father of S.Y. and Z.Y., does not appeal the termination of his parental rights.

## OPINION

BILLINGS, Associate Presiding Judge:

¶ 1 T.Y. appeals the juvenile court's order terminating her parental rights to S.Y. and Z.Y. We affirm.

## BACKGROUND

¶ 2 T.Y. is the natural mother of eight-year-old S.Y. and three-year-old Z.Y. On July 12, 2000, an investigator for the Division of Child and Family Services (DCFS) and two police detectives went to the parents'[1] home to investigate a referral regarding the possible production of methamphetamine (meth). When they arrived, the garage door was open and one of the detectives smelled an odor he believed indicated meth production. The DCFS investigator testified she spoke with T.Y., who denied using drugs but admitted she was selling meth out of her home. One of the detectives testified the father produced a quantity of meth, a digital scale, and a smoking pipe. Later that day, DCFS placed the children in protective custody for safety reasons relating to, among other things, the presence and sale of meth in the home.

¶ 3 On October 27, 2000, the juvenile court deemed the children neglected and continued temporary custody of the children with their maternal grandmother. As directed by the juvenile court, DCFS issued a family service plan on November 6, 2000, requiring the mother to: 1) complete random urinalyses (UA's);[2] 2) complete a drug and alcohol assessment through Salt Lake County Substance Abuse Center; 3) provide safe, stable, and adequate housing and maintain employment; 4) visit the children upon completing two clean UA's; and 5) provide a safe, drug-free environment for the children.

¶ 4 In early November of 2000, after receiving further information that both parents were still active in the meth trade, police recovered a small bag containing meth residue in the trash outside of the parents' residence. Police executed a search warrant at the parents' home several days later and

**2.** During the month of July 2000, T.Y. tested positive for meth five times.

recovered an iodine lab,[3] a quantity of meth, bottles of ephedrine tablets, firearms, scales, and packing material. According to one detective, T.Y. stated that she had a meth addiction but was not involved in meth sales. Both parents were arrested and temporarily incarcerated, with criminal action still pending at the time of the termination hearing. Also that day, a DCFS caseworker found bottles, diapers, formula, baby food, children's clothing, toys, and a half-used bottle of Z.Y.'s prescription formula in the parents' home. T.Y. was not at that time authorized to visit with the children.

¶ 5 On January 12, 2001, a DCFS caseworker reported T.Y. made no progress regarding the five service plan directives issued by the juvenile court on November 6, 2000. DCFS filed a petition to terminate both parents' parental rights to S.Y. and Z.Y. on January 25, 2001.

¶ 6 During the time the parents were not authorized to visit the children, who were in the custody of their maternal grandmother, the parents were pulled over by police during a traffic stop on June 15, 2001 and cited with three counts of having children in a vehicle with improper restraints. Two of these children were S.Y. and Z.Y. The children were removed from the maternal grandmother's home and placed in a foster-adopt home, where they remain today.

¶ 7 On January 10, 2002, police searched the parents' trash and found: meth; a glass pipe; a tube and plastic straw; thirteen bottles of Heat, a chemical used to soak pill binders to separate pseudoephedrine as part of meth production; fifty-three empty bottles of pseudoephedrine, an over-the-counter medication often used as a precursor to meth; and a large quantity of empty matchbooks without the striker plate, which can be used to harvest red phosphoreus in the production of meth. By one detective's calculations, the amount of precursor chemicals they found in the trash could manufacture up to four-hundred-fifty-six doses of street meth. During execution of a search warrant on January 16, 2002, police found a large amount of drug paraphernalia, meth, and ephedrine in the parents' home. In T.Y.'s bedroom, police located meth, glass vials, and several pipes. Police arrested T.Y. on meth-related charges.

¶ 8 At the termination hearing, the foster mother testified that S.Y. told her she knew her parents were doing drugs and it scared her. S.Y. also told her foster mother she knew where the drugs were in her parents' house and was not allowed to let her friends into the bedroom. S.Y. further described to her foster mother "a long thin thing with a thing on the end that [T.Y.] would dump something in and smoke."

¶ 9 In terminating T.Y.'s parental rights to S.Y. and Z.Y., the juvenile court emphasized the children's numerous exposures to meth and meth production, as well as T.Y.'s addiction to meth and its effect on her ability as a parent. The court found nothing had changed with T.Y., except that she had become more and more emaciated. In its Findings of Fact, Conclusions of Law and Order Terminating [T.Y.'s] Parental Rights (termination order), the court found, inter alia, that T.Y. neglected the children and is an unfit parent. T.Y. appeals the termination order.

## ISSUES AND STANDARDS OF REVIEW

¶ 10 T.Y. first asserts the juvenile court failed to make findings required by the amended version of Utah Code Ann. § 78–3a–407 (termination statute), effective May 6, 2002, in its order terminating T.Y.'s parental rights. The juvenile court's decision concerning which version of the termination statute applied is a matter of statutory interpretation, which presents a "question[ ] of law which we review for correctness, according no particular deference to the [juvenile] court's interpretation." *State v. Coleman,* 2001 UT App 281, ¶ 5, 34 P.3d 790 (quotations and citation omitted). However, where "a party ... fails to bring an issue to the [juvenile] court's attention," that party is "barred from asserting it on appeal" absent a showing of "exceptional circumstances or plain error." *Brigham City v. Stuart,* 2002 UT App 317, ¶ 14, 57 P.3d 1111.

---

**3.** Police testified iodine production is a precursor to meth production.

¶ 11 Next, T.Y. argues the evidence supporting the juvenile court's findings and decision to terminate her parental rights was insufficient. "Findings of fact in a parental rights termination proceeding are overturned only if they are clearly erroneous." *In re G.B.*, 2002 UT App 270, ¶ 9, 53 P.3d 963 (quotations and citation omitted). "The clearly erroneous standard requires that if the findings ... are against the clear weight of the evidence, or if the appellate court otherwise reaches a definite and firm conviction that a mistake has been made, the findings ... will be set aside." *In re S.L.*, 1999 UT App 390, ¶ 20, 995 P.2d 17 (alterations in original) (quotations and citation omitted). "Moreover, we defer to the juvenile court because of its advantageous position with respect to the parties and the witnesses in assessing credibility and personalities." *In re G.B.*, 2002 UT App 270 at ¶ 9, 53 P.3d 963 (quotations and citation omitted).

## ANALYSIS

### I. Retroactive Application of the Amended Termination Statute

¶ 12 T.Y. argues the amended version of the termination statute, effective May 6, 2002, applied to the juvenile court's termination order. The termination statute provides the grounds upon which juvenile courts may terminate parental rights. *See* Utah Code Ann. § 78–3a–407 (2002). In relevant part, the amended termination statute added the following provision: "In any case in which the [juvenile] court has directed [DCFS] to provide reunification services to a parent, the court must find that [DCFS] made reasonable efforts to provide those services before the court may terminate the parent's [parental] rights...." *Id.* § 78–3a–407(3)(a).

¶ 13 T.Y. first points out that in October of 2000, the juvenile court ordered DCFS to provide reunification services to T.Y.'s family through the implementation of a formal service plan. Because T.Y.'s termination trial

did not conclude until May 22, 2002, and the juvenile court issued its termination order on June 5, 2002, T.Y. contends the juvenile court erred in not first finding DCFS made "reasonable efforts" in its reunification services before terminating T.Y.'s parental rights.

¶ 14 However, T.Y. did not make this argument to the juvenile court. Thus, T.Y. can only obtain relief from this court by demonstrating plain error by the juvenile court or exceptional circumstances. *See Brigham City*, 2002 UT App 317 at ¶ 14, 57 P.3d 1111; *Coleman*, 2001 UT App 281 at ¶ 5, 34 P.3d 790. On appeal, T.Y. does not argue plain error or exceptional circumstances, and we therefore decline to address T.Y.'s claim. *See Brigham City*, 2002 UT App 317 at ¶ 14, 57 P.3d 1111.

### II. Sufficiency of the Evidence

¶ 15 T.Y. challenges approximately twenty of the juvenile court's individual factual findings from its termination order in arguing the evidence was insufficient to terminate T.Y.'s parental rights. We focus on several of the juvenile court's findings regarding the children's exposure to the use and production of meth,[4] and conclude those findings are not clearly erroneous and were sufficient to support the juvenile court's decision to terminate T.Y.'s parental rights.

¶ 16 The juvenile court terminated T.Y.'s parental rights because, inter alia, T.Y. "neglected the children" and is an "unfit ... parent[ ]." Under the termination statute, "The [juvenile] court may terminate all parental rights with respect to a parent if it finds any one of the following: ... that the parent has neglected or abused the child;" or "that the parent is unfit or incompetent." Utah Code Ann. § 78–3a–407(1)(b), (c) (2002).[5] "In determining whether a parent or parents are unfit or have neglected a child the [juvenile] court shall consider, but is not limited to, the following circumstances, conduct, or conditions: ... habitual or excessive use of ... controlled substances, or danger-

---

4. Although some of the juvenile court's challenged findings do not directly involve meth use and production, we find it unnecessary to address the sufficiency of every individual finding challenged by T.Y.

5. For convenience, we cite to the most recent version of the termination statute, which remains substantively unchanged within the portion cited.

ous drugs that render the parent unable to care for the child." Utah Code Ann. § 78–3a–408(2)(c) (2002).

¶ 17 The juvenile court's findings involving the children being exposed to meth use and production include: "13. The parents' habitual use and involvement in the production of methamphetamine has caused them to be unfit parents"; "22. The evidence found in the home ... shows clear evidence of production and use of methamphetamine"; and "40. Methamphetamine has been and continues to be used, produced and sold in the parents [sic] home, and this situation has not changed." We conclude there is ample evidence to support these findings.

¶ 18 For instance, a detective testified that on July 12, 2000, he smelled an odor indicative of meth production in the parents' garage, and recovered meth and drug paraphernalia from the father. A DCFS caseworker testified that also on July 12, T.Y. admitted she was selling meth out of the home. In early November of 2000, both parents were arrested and temporarily incarcerated after police found meth residue in the parents' trash and recovered an iodine lab, a quantity of meth, bottles of ephedrine tablets, firearms, scales, and packing material from the parents' home. A detective also testified T.Y. admitted she was addicted to meth. The State further presented testimony that on January 10, 2002, police searched the parents' garbage and found meth, paraphernalia, and enough meth precursor chemicals to manufacture up to four-hundred-fifty-six doses of street meth. In T.Y.'s bedroom, police also found meth and paraphernalia, and arrested T.Y. on meth-related charges.

¶ 19 Additionally, the foster mother testified at trial that S.Y. told her she saw her mother smoke meth and was frightened of her parents' drug use. According to the foster mother, S.Y. also said she knew where the drugs were in her parents' house and was not allowed to let her friends into the par-

ents' bedroom. Also at trial, the judge observed that in the previous year and a half she "watched T.Y. become more and more emaciated."

¶ 20 The evidence is sufficient to demonstrate T.Y.'s neglect and unfitness as a parent. The juvenile court could "reasonabl[y] infer[ ]," *In re J.W.*, 2001 UT App 208,¶ 7, 30 P.3d 1232, that the children's exposure to T.Y.'s ongoing drug use and meth production in the home "render[s T.Y.] unable to care for [her children]." Utah Code Ann. § 78–3a–408(2)(c). As the juvenile court explained, whether T.Y. personally participates in meth production is irrelevant, because "[t]he fact is that production of methamphetamine in [T.Y.'s] home is extremely dangerous, and ... present[s] a clear, constant danger to [T.Y.'s] children." The juvenile court also reasonably concluded that "use of methamphetamines is totally, completely inconsistent with responsible parenting." In sum, T.Y.'s insufficiency claim fails.

## CONCLUSION

¶ 21 Because it was not presented to the trial court, we refuse to reach the issue of whether the amended version of Utah Code Ann. § 78–3a–407, requiring a trial court to find that DCFS made reasonable efforts to provide services, is applicable to this case. Further, we conclude there is sufficient evidence supporting the juvenile court's findings and decision to terminate T.Y.'s parental rights. We therefore affirm.

¶ 22 WE CONCUR: RUSSELL W. BENCH, PAMELA T. GREENWOOD, Judges.